2011-1156. Good morning, Your Honors. May it please the Court. My name is Amber Davis and my co-counsel Jackson and Brownlee and I have the pleasure of representing the defendant, Appellant DelZotto Products of Florida. This case centers around two patents for a retaining wall block and a method for building a retaining wall. After a three-day bench trial, the District Court found that Plaintiff's patents were valid, the defendant infringed, and that an injunction was warranted. We respectfully request that this Court overturn the District Court's decision in all respects for three main reasons. First, the District Court construed certain limitations in the 098 and 304 patents improperly, which under a proper construction would have invalidated the patents under Sections 102 and 103. Second, this improper claims construction carried over into the infringement analysis, wherein the District Court erred when it held that the defendant's bull rock block had an alignment device, and when it relied on the capable of infringing use line of case law, even though Plaintiff's claims were not drawn to capability. And third, the District Court abused its discretion when it fashioned an injunction that exceeded the scope of the patent in what was proven at trial. Under the first issue, Your Honors, claim construction receives plenary review on appeal. Did you all ever object to the claim construction? We did at trial, Your Honors, and in our motion for summary judgment. There was no mark in the hearing, however. The parties, it was a simple device, and the parties believed that there was an agreement as to the terms. The magistrate judge interpreted the claim? Yes, the magistrate judge entered a report and recommendation. And the District Court judge accepted that? If you look at page 8 of the record, there's very little to no analysis regarding claim construction or invalidity by the District Court, but it is implied that the court construed the claim specifically comprising in accordance with Plaintiff's interpretation. It's our position that this was error, Your Honors. The term comprising, Plaintiff argued it meant is, and we argued that it meant to include or contain. Your argument in front of the magistrate was that the claim should be interpreted to have numeric limitations, dimensional limitations. That was part of our argument? That was part of your argument. And the magistrate judge rejected that and said, no, the patent itself says there are different geometries, so it's not limited to a thing where there's only a quarter of an inch or an eighth of an inch lag on either side of where the pen fits in. And said, so long as you have a geometry where you have a lifting device on top and you have an aperture and opening on the bottom that's sufficient to engage the thing, then that satisfies the test. That is what the court said with respect to infringement, Your Honors. That's what the, as I read it, that's what the magistrate judge said by way of claim construction. And the District Court judge said, I accept the magistrate's report. I've got the thing right in here. Yes, Your Honor. But we also have a problem with the way We didn't actually have us appeal the claim construction. You appealed the infringement, right? No, we did appeal the meaning of the term comprising, and that's in our brief. I believe it's at page 1415. And we also argued it at trial. I mean, it was our position at trial that it meant to include or contain. And there's Federal Circuit case law, which specifically states, and this is CS versus I thought you said 1415. I'll find it for you, Your Honor. That's not the issue here now, is it? I mean, it seems to me that what you're saying is that this ought to be construed in accordance with the specification, which is the same argument you made before the District Court, right? Well, Your Honor, it depends on if we're looking at invalidity or infringement. Because under invalidity, when we look at comprising, the question is whether or not Well, let's stick with infringement for the moment. We've got to have the same claim construction for infringement and invalidity in any event. But your argument, which you made before the magistrate judge and which you made today, is that the construction of alignment device ought to be in accordance with the specification, correct? Correct, Your Honor, yes. Okay, so that seems to be the key issue here. Okay, well, I agree, Your Honor. And when we discuss what the specification says, the specification says that as the block is being lowered onto the lifting device, it shifts back and forth, and then it's aligned. And with our block, Your Honor, And by aligns, it means that if you want the faces to be even, they're even, and if you want the faces to be offset a little bit, they're offset. Correct, Your Honor. But in our case, as discussed by Laura DelZotto during her testimony, the only way that the defendant aligns their block, and this is at page 504 of the record, the way they align their block is they use a system of drill and pins. So what they do is, as the block is lowered, after the fact, they set in pins and use manpower and other types of machinery to align the block. That's not quite right, because if I understand, I've read the testimony, I understand the testimony that the defendant's block, the lifting ring, doesn't have a snug fit into the recess. There's an 8-inch differential, at least. And what the testimony for the plaintiff was is that this still is an alignment device because if in setting the block you push against one edge of the ring, it will help contain it on one side. And basically what you're saying is that for it to function as an alignment device, it has to function on both sides of the ring. Do I make myself clear? Yes, Your Honor. That is part of our argument, yes. And what you're discussing is when a plaintiff argued at trial that if you lowered the block onto the previously set block and you pushed it back 4 inches, because our advertising brochure touted a 4-inch setback, that somehow now this means the lifting device is performing an alignment function. We disagree, Your Honors. Alignment device. That's the key question here, isn't it? Yes, that is the key question. That's the one-side, two-side issue. Well, in what way? Because in the drawings it shows the one side of the lifting device is touched by the block. Right. In order to produce the 4-inch offset. So that's the question of whether or not this lifting device has to, in order to perform alignment, has to have both sides, if you will, of the lifting device engaged in the alignment function. And it's our position that it does. Show me in the patent where it says that. Well, if you look at the specification at paragraph or column 4, lines 55, column 5. Actually, column 4 wasn't in the appendix, which was not very helpful to whoever put the appendix together. If you look at the patent that's in the appendix, it doesn't have column 4. Most of it. If you look at page 91 of the record, Your Honor, the bottom of page 91 to the top of page 92. 91? Yes, Your Honor. If you look at line 63, as the block is lowered into place on previously set blocks, the shape of the alignment channel has an aligning factor on the block as it is lowered onto the lift and alignment rings of one or more previously laid blocks. If the block is slightly too far to the front or back, the weight of the block will cause the block to shift as it is lowered until the lift and alignment rings lie within the aligning channels. This is how the lift and alignment rings perform their aligning function. Your Honor, it's our position that the aligning function occurs when you drop the block onto the previously set block. It hits the ring and then it's aligned. There's nothing in the patent or the specification or any of the embodiments that talks about pushing a block back. So what you're saying is there has to be a snug fit so that if the block is slightly too far on either side, it will fit into the recess and align the block, right? Yes, Your Honor, and what I'm saying is our recess is 12 inches. Our lifting loop ranges from... That's the preferred embodiment. No, no, no. Their preferred embodiment is a 4 1⁄2-inch recess and a 4-inch lifting loop. I'm saying our block, the defendant's block... Your block, but we have a bigger hole. We have a much bigger hole. Much bigger hole. Your Honor, yes. And your much bigger hole, you say, doesn't perform an alignment function. That is our position, Your Honor. There's no proof at trial that our block, our lifting device, was ever used or could ever be used as an alignment device. Well, correct me if I'm wrong. The evidence of actual infringement are five pieces of a structure that is at your client's place when they put rock and gravel in that little U-shaped enclosure. That's correct, Your Honor. There was a rock bin that was created by the defendant's daughter, and when she created the rock bin, she put corner blocks in odd places, and the way that she constructed the wall, there were, I can't remember how many blocks, but let's say there were at least 50 blocks because I saw it in person. And in only five... We have it in the record. Yes, we do, Your Honor. It's at page A, 1385, 1384, 1383. So on that wall, there was only five locations where the lifting... And there's actually a drawing. Yes, there's also a drawing. I'm sorry, what was the page, Your Honor, so I can be on the same page? 1387, 88, 89 show the five instances in which the lifting device supposedly had performed an aligning function. Well, I would disagree with your last statement. It does show five places where the lifting device happens to be within the recess, but there's no proof that when the crane dropped the block onto that, onto the previous set block, that the lifting device aided in alignment in any way, shape, or form. Well, there's no snug fit. There's no snug fit. No, there's not, Your Honor. And our block, one of the... It seems to me, and correct me if I'm wrong, you're making two arguments. One, that there has to be a snug fit, and second, that for a running bond, that you have to have offsets and that your blocks can't have offsets if you put the ring into the recess. In other words, it just doesn't work that way. Right. And their response to that, this Rockbin argument is responding not to the snug fit argument, but to the second argument about it doesn't work with a running bond, and they're saying, oh, well, there's some instances in which you're stacking one on top of the other and the ring does fit into the recess. Well, the only reason... Is that correct? Yes. I mean, in running bond, in partial running bond, in proper construction of a retaining wall, the lifting device in our block will be within the void. It'll be within a four-foot, eight-inch void. It's not within the recess. The only time that it could possibly be within the recess is if you stack them on top of each other for storage purposes. But this wall... That's a second non-infringement argument. Yes, Your Honor. But we would suggest... Where do we get the snug fit? Because the prior art, the alleged anticipatory reference, was a snug fit instance. That's the cause of fiddling, and they talk about having interlocking, because you're talking about interlocking as well. I'm not necessarily talking about interlocking. I'm just talking about when it's lowered onto the block, the specification says that it needs to... It shifts, and then it sets down. Well, it's not a snug... If it shifts and has enough room to shift very far, it's not a snug fit. Well, if it shifts, it's hitting the lifting device. The preferred embodiment has a quarter of an inch, correct? Yes, Your Honor. A quarter of an inch. Half an inch. Half an inch, I'm sorry. It's a half inch, but it's a quarter of an inch on each side. Correct. So it's a quarter of an inch, and that's it. So you're lifting something that weighs 2,000, 3,000 pounds, and you have a quarter of an inch leeway to get it in the hole? Yes, in their preferred embodiment, in the way that their patent is actually practiced. That's what they're... And that's what you said the claim should be limited to. I'm not saying it needs to be limited to a quarter of an inch. I'm saying that 12 inches with 4 inches on either side is not enough and does not align. And the plain and simple... In the order of things, why isn't that snug with a 3,000-pound piece of cement? Why is that... Yeah, why isn't that snug? You guys are running a big lift device, and the notion that you have to have some leeway if you're going to drop it down. That's true, but you could drop that block down without ever touching, without ever touching the lifting device. So how is that lifting device acting as an alignment device? And one last thing as I close. When you drop it down and you've got the lifting device is sticking out from the block that's down there, if a piece of the opening of the block that you're trying to lower it down to hits the lifting device, it's assisting in aligning because it means you ain't aligned right. So even if you have a large cavity and you've got a relatively small loop and you're dropping it down, the operator's watching, and as the block is going to sit down, if the loop is not inside the hole, you're not aligned. And if the loop is just a little bit off to one side, you're not aligned. So as soon as the loop falls into the cavity, you're aligned. I think one last point, Your Honor, is that the patent calls for a recess that is positioned to receive a lifting device. Our recess is not positioned to receive a lifting device. Our void is positioned to receive a lifting device. We have a lifting device. We have a recess. We concede that, but it's not an alignment device. An 8-inch differential is not going to perform this aligning function. No, but it can. Your bottom of your block can receive what's on top of your block. But I think what you're saying is it can, and that gets into the capable of infringing use line of case law that the court relied on and should not have relied on. If you look at ball aerosol, the claims need to be need to specify that it's drawn to capability. In this case, our plaintiff's claims were not drawn to capability, and it was improper for the court to rely on that case law. They should have, and they needed to prove direct proof of infringement. At two points, the district court judge, I believe it was during the trial, like the second time he said, I don't want to repeat myself, he said, you know, why aren't the claims in this suit obvious? Why aren't they obvious? Yeah, he said, you know, all you've got to do, you look at the anticipatory device, and you say, well, you know, if you're not trying to create this perfectly snug configuration, and you want to have a lifting device that you can lift it up with, and you want to have some form of help to align, then shave off the knob, lift the lift up, and cut a hole in the bottom. I 100% agree with you, Your Honor. But you didn't make that argument. No, we did make that argument. If you look at the prior article... You made the argument that you should combine two references? Well, we made an argument that if you look at the 642 patent, it claims all of the structural limitations that are in the patent. It may not have the functional limitations, but as this court is well aware, it's not required. The prior art is not required to have the functional limitations. It only has to have structural. It has a lift and alignment device. The connector pins on the top with the lifting loop, it has an alignment device comprising a lifting device. It has a lift and alignment device. It has a recess. It has everything that's required. In that patent, all one would have to do is simply replace that looped cable with rebar and have it protruding slightly above the surface, and then as the block is lowered, it's going to engage it and align. That would have been obvious. This isn't rocket science, Your Honor. So it's just engaging is enough to perform the aligning function? If it hits the alignment device, shifts back and forth, and helps align as it's going down, then that would be performing the aligning function. But if the court's going to read the claims... But I guess the assumption is that in the wall that your client is accused of having where it's infringing devices, when they stack them up at least in five iterations, when they set them down, in order to get them set down where they were, they had to bump up against the lifting device because it's shown as touching right on the side. That's plaintiff's argument. So that serves some of this function. But I would argue, Your Honor, if you're going to construe the claim so broadly to encompass our recess and our small lifting device, then you need to construe the claims just as broadly and look at the prior art. If you look at the 642 patent, it's either anticipated under 102, it's our position that it is, or it at least would have been obvious to create this block. It's not rocket science. This is a very simple, predictable device. That's a chaos argument. There are just a limited number of possible configurations here. And if what you were trying to achieve was a lift device that could assist in alignment that didn't actually require perfectly snug, tight, like the 642, and that doesn't seem to be a stated purpose of the patent, is not to have this snug, engaged locking device because they say the ballast is what is going to give it the structural rigidity. Right. I mean, it's absolutely KSR, Your Honor. I mean, KSR specifically says that if there's a finite number of ways to do something, and, I mean, here there was a lifting device and there was a problem in the industry. People had to torch them up. All they did was create a recess and have the lifting device fit within the recess, and we argue that that's common sense, Your Honor, not innovation. Thank you. All right. Thank you, Ms. Davis. Mr. Weissman. Thank you, Your Honors. Joe Weissman from Johnson's Polk in Tampa, Florida, on behalf. I'm still in strife. Let me start with this observation that came up at the end of the argument with respect to obviousness. But one needs to go back, and it's in the brief, and I don't want to go into this in too much depth. But the testimony at trial was unanimous, that this was a unique development, and that prior to the development of the Stonestrong invention, no one had ever used an alignment device for purpose or a lifting device for purposes of alignment. So to look back now with 20-20 vision and say, well, wouldn't that have been obvious to have used that lifting device for alignment purposes is a somewhat faulty presumption because as of that time, after many, many years of blocks that were used as retaining walls, for the first time, Stonestrong is the one that not only uses any lifting device but uses a lifting loop for purposes of alignment. And as the expert testimony of Mr. Thiel and Mr. Jenkins went into in great depth at trial, this was something that was completely novel. When they saw this for the first time, they thought, wow, what a great idea. This is something that has never been done before. This is something that allows us to increase the efficiency of the building of these walls, and this is something that allows us to use less people when we put these walls together because, again, these are very heavy blocks. You have somebody with a crane or some other type of device that's lowering these as I believe there's no dispute about. Isn't the prior show many examples of lifting devices, for example, on the top of a septic tank lifting device to lower it down? I mean I've walked past many construction sites. I see lifting devices used all the time. Why was there something new in a concrete block? Well, first, Your Honor, two answers to that question. First of all, we don't believe a septic tank is analogous to prior art. You don't place one septic tank on top of another septic tank and then build on top of each other. You have a lifting device that places a septic tank, and then you're done. This is a different type of art where you have one block that's placed on top of the other, and then in that case the lifting devices may become relevant. Secondly, previously these lifting devices were recessed. They were not generally sticking out. To the extent they were sticking out, they were stuck out when the block was taken out of the mold, and then they were cut off. They had nothing to do with building a wall because they were either on the side of the wall or of the block. But there were plenty of blocks where there were alignment devices, right? There were, Your Honor, but not plenty. So what the invention is here was combining an alignment device which existed before with a lifting device. That's correct, Your Honor, but keep in mind, as I went through in the brief, the history of these blocks were that they were not these large blocks. They were usually handled manually, and so you had a lifting device was a person lifting them by hand. It wasn't until about the late 1990s, early 2000s, that you start getting these big blocks that have lifting devices that are necessary to place the blocks in place. Even then, these lifting devices, as in the patent that's cited with respect to anticipation, were recessed. The purpose of the recess was because the lifting device was going to have nothing to do with the alignment. Have you got a copy of the appendix? Could you look at 1311? This is one of those cistern cases. The thing that Reina was talking about. It's 1311. I'm sorry, it must be volume 2. There's a top of 1311. There's a picture of what appears to be a cistern of some sort. Your Honor, I see the picture. I see the picture. That is not... And it's got some things that look like they might have been used as lifting devices to lift the thing up? Yes, Your Honor. Now, a lid is going to go down on top of that? Your Honor, I don't know. These are pictures that were presented into evidence by the defendant that had nothing to do with retaining walls. No, but they're stacked, aren't they? And the lifting device is fitting into a recess in the upper... They are not, Your Honor, I don't believe, with all due respect. If you look, for example, at the bottom of page 1311, you have... Circular lids that are obviously going to go on a circular cistern, and they have three hooks on top that presumably are going to be used to lift the heavy thing up, right? And if you look at it, it looks like one of the... These are three, on the picture on the right, for example. I don't believe there's anything in there that... It looks like there's one on top of the other in terms of lifting devices. Well, if you look on 1311, look over to the left, there appears to be a circular cistern that has an oblong hole in it that has protruding hooks that presumably were used to lift it up. Correct. If you're going to put a lid on it, the lid is going to squash, either squash those things down, or the lid is going to go into a recess. Your Honor, I'm not... There was no evidence at trial as to how these were used. All I can say is... But you might want, you know, if you were thinking about this and wanted to get a patent on these, and you wanted to apply this cistern thing to concrete blocks, you might say, hey, we can lift them up real easy by putting hooks on the top. And I see some hooks over there. All we've got to do is have a recess in the bottom of the device to drop the lid down onto. Your Honor, that may or may not be the case. We would submit, again, this is not analogous prior art. And the reason why I say that... Why is this not in the patent? Because these are concrete devices, yes. But it's not analogous prior art because these are not devices in which it was... They're utilized by placing one on top of the other like a concrete... Did you object to these things as non-analogous at trial? I didn't see that. Your Honor, I think that would go to weight, not to admissibility. But, no, we did not... If it's non-analogous prior art, it's out. It doesn't go into the 103. That's a gatekeeper. Your Honor, no... I didn't see you objecting to these cisterns as being non-analogous. Your Honor, we did not. And the reason why we did not is we didn't believe it was necessary, to be honest with you. The way this discussion began is when I referred to what the district court said the first time around when it was at trial. It says, hey, you know, this is pretty simple stuff. The modifications are quite simple. And if what you're trying to do is simplify and cut the cost, which is what anybody's trying to do, shave the knobs off the 642, lift the lifting device up a little bit, make it crowded to the surface, stick a hole in the bottom where you used to have for the knobs, and it became filtered. Well, Your Honor, the trial judge, Judge Hodges, obviously came to the conclusion that that was not the case because he ruled that... Without any analysis. Well, he said it was not anticipated. And in saying so, he had to have concluded that it was not a device, first of all, in which there was a lifting device that also served an alignment function, which it did not, by the way. And, of course, their burden on appeal here is to show that it was clear error on behalf of the trial judge. Well, obviousness is a question of law. Well, the factual findings beyond obvious, though, are clear error. What factual findings? The factual findings as to the makeup of the devices. In effect, let me quote. It's the Transocean case that... But what factual finding are we talking about here? Where's the factual finding? What each particular prior reference discloses is a factual finding. But he didn't make any findings about that. Your Honor, that is correct, but what he did do, obviously, and no pun intended, in finding that obviousness was not satisfied was determine that it would not have been anticipated by anyone involved, at least someone who's within this field, someone skilled in the relevant art. The only two people that testified at trial with respect to the relevant art were Mr. Thiel and Mr. Jenkins. And they testified, and this was unrevited testimony, that even with that prior art, this is not something that was on anyone's mind or would have been on anybody's mind. These are people that have been in the industry for 25 years, and I believe 15 years respectively. They saw this prior art. With respect to the 6-4, the Kelly patent specifically, the preferred embodiment actually does not have, if you look at that patent, does not have the hook coming out of the same place where the alignment hub is, the concrete alignment hub. The preferred embodiment has it in the middle of the device. Yeah, but why isn't this sort of like wires? You're familiar with the case wires versus master lock? I'm not, Your Honor. Well, but it's locking technology. These are simple mechanical devices. And we've said with respect to simple mechanical devices, of which this obviously is one also, that we can just look at it and see whether it's obvious that that's the sort of thing that can be done without the benefit of expert testimony. Well, Your Honor, I think, again, we're looking at the issue of obviousness with 2020 hindsight, and we're not looking at this industry. This industry had a history, again, of using manually held blocks that had no lifting mechanism. Then there were two blocks that came in that had a lifting mechanism that was in the way and was used as a recessed lifting mechanism. And then, again, there were concrete hubs or blocks. There was nothing, and that includes the Kelly patent, that had a lifting mechanism that was also used as an alignment device. Now, I understand the question. Why wasn't it obvious at that point that you would use the lifting mechanism as an alignment device? And the reason why that was not obvious at that point was because it was never considered in this industry that a metal bar could serve that function. And you have these huge blocks in this case, and as the plaintiff admitted, or the appellant, when these are being lowered down by crane, they're shifting, as Judge Clevenger said. They're shifting left and right. And the snug issue is really an irrelevant issue because all you need is one contact. And when these large blocks are falling, you're going to have this bar that, with a 4-inch setback and a 12-inch hold... Well, Your Honor, the testimony is, yes, they would. No, I'm asking you, it says, as the block is lowered into place, it has an aligning effect on the block. If the block is slightly too far to the front or back, the weight of the block will cause the block to shift. That doesn't happen with the defendants. It would, Your Honor, and the reason I say that is because the unrebutted testimony... Should it be far in front or back? Yes, Your Honor. That testimony doesn't say that. I've read it. Show me where the testimony says that. Your Honor, let me explain why I say the testimony says that. Mr. Teel... Does the testimony say, if you lower it slightly too far to the front or back, the weight of the block will cause it to shift? Is there such testimony? With respect to the Gold Rock block? Yeah. There is testimony to that effect. Show me. Okay. I don't have a specific site except to say that if you look at the testimony of Mr. Teel and Mr. Jenkins, they both say... I have read it, and that testimony was never given. Your Honor, if I could just finish what I was going to say. But if you can't show it to me... I mean, you're supposed to be familiar with the record when you find it. It's not sufficient to say, oh, well, it's in there somewhere. If you can't show us the testimony, I've got to assume it's not there. I will bring your attention in the record to the last exhibit, which shows the... This is our wall? The wall drawing made by Mr. Teel at trial, which shows the partial running bond. Okay? Mr. Teel testified with respect... And that's on page 80 in Appendix 1413. Now, testimony that went along with that states that anyone in the industry, whether an engineer, a designer, or a constructor, would look at their block and take advantage of the alignment mechanism, and that when one... The only need is at least one alignment device that fits within a recess in the block below it, and that when that block is being lowered, it would be placed, at least one of them, in partial running bond, which would work throughout the wall. That's a different argument. That's not... Would it be done because you use it to align on the side or on the front and the back? Correct. I'm going to say that if the block is slightly too far to the front or back, the weight of the block, it doesn't say that. That's... That... You mean the testimony doesn't say that it would... That's correct. But that's the whole point of having the notch, is that when it's lowered... Where does it say that in a... Where there's an 8-inch void or a 12-inch void that if it's slightly too far one way or the other, it'll cause it to shift? It doesn't... Well, okay, there is testimony, and again, Your Honor, you're going to have to... I don't have a specific site for you. Maybe that's very unhelpful, but that because of the weight of these blocks, they're so heavy, that especially when you have a 4-inch setback, which is going to go right up against, which is suggested by the defendant in their own marketing brochure, when you have a 4-inch setback, it's going to have to hit. And so when your block... With a defendant's block, it could still... The ring could still fit in the void and be totally out of alignment, correct? It could, but there's two... But there's two arguments against that, Your Honor. One is the unrebutted expert testimony that it's not the way these blocks would be used, and second is the fact that the... To be used, that means in connection with the wall. With a wall or in storage, because... This isn't the only actual evidence of infringement, the wall, that's page 1386. Well, Your Honor, that is the only actual evidence in terms of construction, but if the block itself is infringing... They built that wall, by the way, after... I haven't sold... You don't have a block lying in their warehouse that's for sale. Not now we don't. You didn't have it at trial. They've got some forms... No, they had blocks, Your Honors. They had blocks. And those blocks, for example, are pictured in their brochure. Those blocks were on their property. The blocks were in the brochure. They were in the brochure, and they were also on their property. Do you have pictures of them that were on the property? Yes, pictures that were submitted by the defendant showing the wall, shows some other blocks on the property. Well, the wall on the property doesn't tell you anything about the nature of what's in the blocks, whether they have any hooks at all. Of the wall that you're showing us, this infringing wall, there are only five data points in the wall where, allegedly, a lifting device was used for alignment. Sure, Your Honor. What Judge Ike was asking was, how can you say that when those blocks were lifted down, they were used in a front-back, when they were lowering them down, the lifting device was used in front-to-back to align, as opposed to, say, side-to-side. They lift it down, and they're going to side it because they want to lift it over and have the 4-inch over it. Because of the testimony of the experts saying that that's what happens when a block of that size is put down. You have this shifting, and that's what happens. But more importantly, even if they hadn't built that wall, simply making an offering for sale an infringing block is an infringement. And so... I thought their blocks don't even come necessarily with lifting devices in them. They don't. Customers, they say, you tell us what you want to do with a lifting device. That's true, Your Honors. But if you look at the brochure, it shows the blocks with those loops. They suggest a 4-inch loop, which, again, when you put that back with a 4-inch setback, which is identical to what Stonestrong suggests, which we believe was copied, would align the block. Yeah, but let me show you with respect. For this wall construction,  with a 4-inch setback, right? Correct. And with the patented device, if you have the ring in the recess, that's how it happens. It's perfect. It's aligned properly with the 4-inch setback, right? But with respect to the defendant's device, you could still have the ring in the recess, and instead of being properly set back 4 inches, it would be 4 inches over like this, correct? Theoretically, although that's not a sound way to build a wall. Excuse me, Your Honor. But I'm just saying, I mean, the testimony at trial, yes, that's true, but even if you did that, it would still happen. So how does it function as an alignment device if it doesn't, when they're put together, result in the proper 4-inch setback but could have a 4-inch overlay in the other direction? Because the 4-inch overlay would also, on the other side, it would hit. You only have 12 inches in there. But with their ring in their recess, it doesn't necessarily align properly with the 4-inch step. It could be 4 inches in the other direction, which, as you said, is not a proper way to build a wall. Well, okay, but let me, okay, and there might be a misunderstanding here. If you have, they have a 1-foot notch that goes up to 9 1⁄2 inches. They have a 4-inch loop, which they show in their own manufacture. There are 4 inches on either side of that. If you were to move it back a 4-inch setback, it's going to hit. If you're going to move it up, the way Your Honor suggested, 4 inches, it's going to hit on the other side. But it can still be, the ring can be in the recess, and it's not properly aligned, correct? The ring would still be used... At which point you would lift it up, you know, and move it. The ring would still be used for alignment purposes. You're saying whoops, we got it on the wrong side of the 4-inch. I'm sorry, Your Honor. Is that what you said? You'd say that if in action, when you lift it up and you put it down and you've got the shear that Judge Dyke just showed, and you've got 4 inches hanging over, you didn't want it, you'd say, well, the aligning device, we didn't use it properly. Mack, hook it up to the lift again, lift it up, slide it back, and push it so it hits on the other side. That's why you would have two, correct, you would have two people doing that, one on each side. People would be doing the alignment rather than the ring. No, the ring would be, the ring would assist the alignment. And on this, the ring would have misaligned the first time. Because you were trying to build the setback instead of the hangover. It depends. If your purpose was to have it overhang, it would have assisted the alignment. If the purpose was not to have it overhang, with all due respect, it wouldn't, you'd push it, we would have pushed it back. Now, if there was a mistake made, you would lift it back up, and then when this heavy rock block is being... You'd have to align it using people. But the... Yes. In part, but yes. You have to align it using people so that that part, when it's lowered, when it's going rocking back and forth, is kept... Well, to align was never defined. So the question is whether or not this patent requires alignment or assisting in alignment. Your Honor, I think the definition of alignment was agreed upon, and it was the same language that was quoted just now by the... It really was. It was in the 098 patent on pages A91 and A92, column 4, line 62 through column 5, line 5. So that tells you what align means? Yes, Your Honor. And we relied on that at trial. And as these heavy blocks are being lowered and they're shifting back and forth, the loop bar is able to engage one side or the other to make sure that these heavy blocks are positioned in place. Without that loop bar, the humans themselves would not be able to place the blocks properly. And so that's the invention. Right. Okay, thank you, Mr. White. Thank you, Your Honor. You can split the argument. Go ahead. You're not supposed to do it, but you can do it. Thank you. Hi, police court. My name is Jackson Brownlee, and I will be very brief in as much as is used up the time. But the invention is alignment. And each claim of the patent refers to align, aligning, to align, and for aligning. And that's the purpose. That is the novelty of the invention is the self-aligning. The Del Zotto block does not do that. With their theory of putting it down, one block would be up against it, so it would be four inches away. The next one could be over this way. That's not an aligned wall by any stretch of the imagination. It simply does not perform an aligning function. And there's been no proof that it was ever used. Those five places on the wall that is constructed, the only evidence is that based on the drawings done by our client, there are five locations in which the lifting device is in the same location as the recess of the block above it. There's absolutely no testimony whatsoever that it was used for alignment purposes. We submit to the court that it simply could not be used as an alignment function. People would have to align the lifting device. Would you be able to use the device without people? Is it possible to put the wall together without having somebody stand in there and helping out with the alignment? On the defendant's block? Yes, the defendant's block. No, Your Honor. Well, the absolute sheer wall. I mean, if you have a gifted crane operator. If you had a harbor or someplace like that. MIT, better. But a gifted crane operator would never touch, never align. Put that baby down there and make those four-inch walls just like it shows in your brochure. I guess you would still say that. But again, it would be the people aligning it, not the... When it comes to alignment on the wall, tolerances are pretty important, I gather. The tolerance of the alignment. I would think it would be very important, yes. And on the defendant's device, am I correct that there was a tolerance? Once the block comes down on it, there was play in there. In other words, you couldn't just fit it snugly into the loop. There was, I think, a four-inch play. It would be four inches on each side if it was placed perfectly on top of the previous block. So even at that point, further alignment is necessary, and that's where the human comes in. Absolutely. Your client's device clearly doesn't interlock. There's no interlocking and no real tight fit. Presumably then, unlike the patent claims in the patent, presumably you don't warrant your device to be used on a bridge that will bear the weight of a freight train. I'm not certain I'd want to be on a train that went over one of your walls. The patent claims that the individual block can be used, you know, for a bridge that bears the weight of a freight train and is supported by the block of the present invention, not yours. Our client made no guarantees as to the block. In other words, this is a form that will build a block that you can put a lifting device in if you want to, and you can put that lifting device anywhere you want to. But there was no manuals or anything else of warranties or guarantees relative to the block. Thank you, Your Honor. Okay. Thank you, Mr. Marlin. The three cases are submitted.